## CORPORATE STOCK WHICH PROVED WORTHLESS GIVEN IN EXCHANGE FOR PROPERTY.

Common Pleas Court of Hamilton County.

LIZZIE GAISSER V. JOHN HANSEN ET AL.

Decided, 1914.

*Action for Rescission of Contract—Representations as to the Value of Corporate Stock Not a Warranty, But Mere Opinion, When—Such Representations Not False Though Stock was Worthless, When—Impossibility of Making Defendant Good.*

1. In an exchange of corporate stock for real estate, the representation by the owner of the stock that "it was good," or was "as good as gold," does not constitute a warranty of the value of the stock, but is a mere expression of opinion.
2. The failure of a bank three weeks after such a representation has been made by a holder of its stock, does not make the representation false in law, where it appears that the bank had declared a dividend just before the representation was made, and its stock was being quoted at $210 in the market, and the insolvent condition of the bank was known only to its officers.
3. But even were the representation false, it could not be made the basis for the rescission of a completely executed contract; and this is especially true where it would be impossible to make the defendant whole by returning to him stock which is at this time worthless but which at the time the exchange was made was worth more than $200 per share in the market.

*Herrlinger & Dixon,* for plaintiff.
*Frank H. Kunkel,* contra.

GEOGHEGAN, J.

This is an action by the plaintiff to set aside the conveyance by her to the defendant, John Hansen, of a certain piece of property on Main street, ninety-five feet north of Court street, in the city of Cincinnati.

The facts are, that the plaintiff, on and prior to the 27th day of March, 1912, was the owner of the aforesaid property; that John Hansen, the defendant, was the tenant of the prop-

erty and had been the tenant of the property prior to the time that that the plaintiff inherited said property from her father; that sometime early in the year 1912 the plaintiff received an offer for said property from a firm of real estate brokers in the city, whereby they offered to lease said property from her at a rental of $60 a month, with a privilege of purchase at $10,000. The plaintiff communicated this fact to her brother, one E. William Oesper, who at that time and for a long time prior thereto maintained an office for the transaction of his real estate business in the rear part of the store that constituted the first floor of the building upon the premises then owned by the plaintiff. He communicated this fact to Hansen, and thereupon Hansen, having been a tenant for a number of years, desired to purchase the property, and after some conversations Hansen made an offer to purchase the property for $11,-000, and the following contract was entered into by and between him and the plaintiff on or about the 20th day of March, 1912:

"I the undersigned authorize E. Wm. Oesper to sell my house and lot No. 1015 Main St., Cincinnati, Ohio, for the sum of eleven thousand ($11,000) dollars on the following terms, to-wit, to take the following stock in part payment:

16
17 Shares 2nd National Stock to the value of *$3995.00*    3760.00
16
17 Shares U. S. Printing to value          *1547.00*    1456.00
     Cash                                 *958.00*     1184.00
                                          ----------
                                          $6400.00
     Mortgage                              4700.00
                                          ----------
                                          $11000.00

"The balance the purchaser to give mortgage on this property to run 5 years at 6 per cent. interest, the purchaser to have the privilege of paying $500.00 at any time. I will pay the taxes due in June, 1912, to the amount of $72.90 all other taxes & assessments to be paid by the purchaser.

"(Signed)    LIZZIE GAISSER.

"I accept the above proposition.

"(Signed)    JOHN HANSEN."

While there is some difference between the parties as to the exact date on which this contract was signed, I am convinced that it was signed some time prior to the date of the consummation of the transaction, to-wit, March' 27, 1912, and was probably signed upon March 20th or thereabout, as testified to by the defendant and the said E. William Oesper. I may state in passing that at the time the contract was signed the words and figures in the contract were as they appear in italics, but that said Hansen had made a mistake with reference to the number of shares of the Second National Bank stock that he held, as well as the number of shares of the United States Printing Company stock, thus necessitating the alteration in the contract, which, however, raises no point of controversy in this case.

This contract was, on March 27, 1912, carried out in its entirety. A deed was executed by plaintiff to the defendant, Hansen, and the defendant, Hansen, executed to her his note and mortgage, in accordance with the terms of the contract; he gave her his check for the amount of cash and transferred to her the various shares of stock, the transfer of the stock being made in the offices of the Second National Bank of Cincinnati, Ohio, which seems to have been not only the transfer agent of its own stock but also that of the United States Printing Company. The plaintiff at this time rented a safety deposit box in the said Second National Bank and placed the shares of stock so transferred to her in the said safety deposit box.

It will be observed that the sixteen shares of stock of the Second National Bank were turned over at the valuation of $235 per share.

After this the parties went their several ways, the deed and the mortgage being duly placed upon record.

On the 15th day of April, 1912, the affairs of the Second National Bank being in an involved condition the said bank was taken in charge by the Clearing House Association of Cincinnati. By what authority this was done is not apparent from anything in the evidence, but, by inference at least, it appears that the Clearing House Association has the authority to take charge of any of its member banks which become in an involved condition. The Clearing House Association, by and through its agents, upon examination of the affairs of the bank, charged

off a considerable portion of the assets of the bank, and after managing the bank until April 30, 1912, the Clearing House Association was compelled to turn the bank over to the representative of the Comptroller of the Currency of the United States, who took charge of the bank, charged off all the rest of its capital and surplus and levied an assessment of $100 per share upon all of the stockholders of the bank in order that the bank might continue business.

It appears from the evidence that these actions, both of the Clearing House Association as well as the comptroller of the currency, were caused by the fact that the bank had made bad loans, and that the paper of borrowers then held by the bank as assets was, in the opinion both of the Clearing House Association and the Comptroller of the Currency, of no value, and that the debts of the bank to depositors and other persons was at least equal to, if not in excess of, its capital stock and surplus. The effect of this was to leave the stock of the bank, on April 30, 1912, worth practically nothing.

This brings us down then to the complaint of the plaintiff herein.

She complains that she was induced to take this stock by fraud and that Hansen and her brother, E. W. Oesper, conspired to get her to take this stock in lieu of cash.

There is no evidence to justify this allegation and a complete and careful analysis of the evidence will show that all things were conducted openly and above board and in this aspect of the case plaintiff has failed in her proof and can not recover.

However, plaintiff further claims in her petition that the defendant, Hansen, guaranteed the stock of the Second National Bank. She says that at the time she agreed to take the stock and also at the time of the transaction, the defendant Hansen said to her that the stock was good and that it was as good as gold. She claims that by reason of the fact that at the time these representations were made the assets of the bank were such as to not make the stock worth the price that she took it at in the deal, but practically worthless, that these representations were false and that she has a right to have the contract rescinded and have an order of this court setting aside her conveyance of the property upon the payment by her of the cash which she received in the transac-

tion, the return of the various certificates of stock, and the cancellation of the note and mortgage. She makes no claim that the mortgage does not constitute a valid lien upon the property transferred by her, nor that the stock of the United States Printing Company is not worth the sum at which she took it over, and she admits that she received the cash upon the check of Hansen that was handed to her at the time of the transfer of the property. She relies solely, as her ground to have a complete rescission of this contract for the sale of the real estate, upon the alleged false statements of Hansen that the stock was good and that it was as good as gold.

1. This brings us therefore to consider the effect of the language alleged to have been used by Hansen, to-wit: that the stock of the Second National Bank was good or as good as gold. Do these words constitute a warranty, or, are they a mere expression or the opinion of Hansen? I am inclined to the latter view.

Ordinarily a statement by the vendor of goods with reference to their value or that they are good does not constitute a warranty of the goods. Now here in this case the parties were dealing with the stock of a national bank in the city of Cincinnati. This bank was a well known bank and, as the evidence showed, its stocks were frequently the subject of sales upon the local stock market. The means of knowing the value of the stock and the condition of the bank were equally within the power of both plaintiff and defendant.

A court, in order to determine whether spoken words at the time of entering into a contract of sale constitute warranties. or create rights of action, must look to all the circumstances of the case and from that determine whether or not the language constitutes a warranty or representation, or whether it is a mere expression of the opinion of the seller. *Williston on Sales,* Sections 194, 203, 628; *Deming* v. *Darling,* 148 Mass., 504; *Brady* v. *Cole,* 164 Ill., 116; *Kennedy* v. *Richardson,* 70 Ind., 524; *Lucas* v. *Crippen,* 76 Iowa, 507; *Lockwood* v. *Fitts,* 90 Ala., 150.

Now, examining all the circumstances of this case and taking into consideration the means of knowledge both of the plaintiff and of the defendant Hansen, it would seem that the words so used constituted mere expressions of opinion upon which no right

of action can be predicated even though it may afterwards appear that the expressions so used were false in fact.

2.   But even assuming that the words alleged to have been spoken by Hansen with reference to this stock constituted a warranty or representation, we are met at that point by the further question:   Were they false as a matter of fact?

The evidence shows that at the time the stock was purchased this stock had a market value of $210 to $215 per share, and in the month of March, 1912, had been sold on the Cincinnati Stock Exchange at that price.   .The testimony in this case also shows that the defendant Hansen transferred the stock at $235 a share, because that was what he paid for it and that the plaintiff made no objection to taking it over at that valuation.   At that time no one knew, except perhaps the officials of the Second National Bank, of the condition of the paper which said bank was holding. In fact, at that time, if the officers of the bank were asked as to the value of the stock of the bank they would undoubtedly have said that the stock was of the value of $210 per share or more. The bank had just prior to that time declared a quarterly dividend of three per cent. upon all its stock, and had published its annual statement in the daily press, which showed that its stock had a book-value of $210 or more.   Now the depreciation in the value of this stock was caused by the arbitrary, though undoubtedly lawful, action of the clearing house association under its rules and the subsequent action of the comptroller of the currency under the authority vested in him by the banking laws of the United States Government.   Both the clearing house association and the comptroller of the currency declared that the paper held by the bank could not be carried as assets, and therefore refused to allow the bank to offset this paper, deemed by them to be valueless, against its debts, with the consequent result that all the capital and surplus of the bank were charged off.

Now a court of equity, when asked to rescind a contract on the ground of fraud, must look at all the circumstances of the case and must be guided by the rules of equity as well as the rules of common sense.   If I were to give the effect to the language of defendant that plaintiff's counsel desires me to, I would

have to say that the alleged representations of Hansen that the stock was good and as good as gold meant that he guaranteed that the Second National Bank of the city of Cincinnati has not made loans to persons who would be unable to pay the same, and that if it turned out that it had made such loans, as it did so turn out, at least in so far as the Clearing House and Comptroller of the Currency is concerned, then his representations must be considered as false and a rescission of the contract granted. The absurdity of such a proposition is apparent. I would hesitate to say, as a matter of law, that any man who says that the stock of a national bank is good guarantees that some lawful authority which has control of the affairs of national banks will not step in and arbitrarily, though it may be lawfully, declare that loans carried by the bank must not be carried as such, but that the surplus and capital stock must be charged off to equalize this forced depreciation of the loans. As a matter of fact and in order to show that this would be unjustifiable, the evidence now shows that more than $300,000 of said paper declared to have been of no value has been collected and other paper is in the process of collection and will be collected, if not for the full value, at least in part thereof.

3. But even assuming that this representation is false, does it give ground for a rescission of the contract?

Counsel claiming this right has not cited to me a single instance wherein a rescission of the contract was granted in equity because of a false representation made as to a part of the consideration for the contract where the contract has been completely executed.

Mr. Dart, in his Law of Vendors and Purchasers, Seventh Edition, Vol. 2, page 808, says:

"Rescission for innocent misrepresentation will not be exercised for executed contracts. In other words, misrepresentation is no ground for setting aside an executed contract, unless such misrepresentation would be not only sufficient to afford ground in equity for rescission of an executory contract, but also is deceitful in contemplation of a court of law, or, as Lord Selborne stated it 'unless there is fraud or misrepresentation amounting to a fraud.'"

And in Pomeroy's Equity Jurisprudence, 3d Ed., Section 884:

"It is now a settled doctrine of law, that there can be no fraudulent misrepresentation or concealment, without some moral delinquency; that there is no actual legal fraud which is not also a moral fraud."

And in *Parmlee, Admr.*, v. *Adolph*, 28 Ohio State, 10, the rule is laid down as follows:

"To constitute representations fraudulent so as to be a ground for the rescission of a contract, they must be both false and fraudulent. If they are made with an honest belief, at the time, of their truth, they are not fraudulent; but if made recklessly, and without any knowledge or information on the subject calculated to induce such belief, and they are untrue, then they are fraudulent."

This same principle is involved in and supported by *Taylor* v. *Leith*, 26 Ohio State, 428. And in *Allen* v. *Hass*, 7 C.C. (N.S.), 579, the distinction between the right to rescind on the ground of fraud and the right to recover damages for a mere false warranty is clearly pointed out by the court speaking through Judge Donahue.

I have examined a great many decisions upon this subject that have been furnished me through the industry of counsel for both sides, but nowhere do I find a decision that would justify me in setting aside this conveyance on the ground of fraud.

The case of *Mulvey* v. *King*, 39 Ohio State, 491, relied upon to a great extent by counsel for plaintiff, was a case wherein the Supreme Court allowed, in an action upon notes given in lieu of purchase money of lands, the defense that the seller of the land had made a misrepresentation as to its extent and that by reason of such misrepresentation the purchaser, who was the defendant in the action, was, by a paramount title, ejected from the possession of a certain portion of the land. This case it will be observed was not a case of rescission and the *ratio decidendi* is expressed in the opinion of the court at page 495:

"The facts thus proved bring the case within the principles above stated and give a right of recoupment in an action for the balance of the purchase money, to the extent of the deficiency

in the value of the property purchased. The rights of the purchaser do not rest upon the ground of fraud, actual or constructive, but that, to the extent of the difference in value between the property as it was represented to be, and the property conveyed, there is no consideration for his promise. He can not, upon any principle of law or equity, be compelled to pay for what the vendor did not own, and could not convey. The maxim *caveat emptor* does not apply to such representations as were made in this case, upon which the purchaser under the circumstances had a right to rely, and in reference to which he was guilty of no negligence.''

It will be observed that the case at bar is entirely dissimilar in its facts to the case of *Mulvey* v. *King.*

While there is some authority for the proposition that a misrepresentation, however innocently made, will give rise to a right of action for rescission of the contract, I have not found a single case wherein, under circumstances similar to those in the case at bar, the court granted a rescission, but I have found numerous cases to the contrary.

4. Counsel claims that by returning the certificates of stock and the cash paid to plaintiff, as well as the cancellation of the note and mortgage, the defendant will be made whole.

I assume that in making this statement he recognizes the maxim that ''he who seeks equity must do equity.'' His statement, however, merely begs the question. He does not show that he can make the defendant whole, but on the contrary shows that at the present time he can not put him in the position he was in on March 20th or thereabout, when this contract was made, or even March 27th, when the contract was consummated. Three weeks elapsed between that time and the first intimations that the Second National Bank was in trouble. Now it is self-evident that as soon as the defendant Hansen contracted to deliver this stock he could no longer make any other contract with reference to the stock. He was thus prevented from selling it in the open market, at which time he could have secured for each share a sum considerably over $200, if the evidence in that respect is to be believed. Now who can say but that in the three weeks or a month that elapsed between the consummation of the

transaction herein involved and the time when it became known that the Second National Bank stock had depreciated to nothing in value, by reason of the actions of the clearing house association and the treasury officials, he would not have been able to effect a sale of this stock at such a price as the market at that time would have evidently afforded him.    If the Second National Bank had not become involved in this trouble we would never have heard of this case.    Therefore it seems to me that it would be difficult to make him whole by returning to him stock that had become worthless by reason of circumstances over which he had no control and of which he had no knowledge.

On the whole case I think that the application of plaintiff for a rescission of this contract should be denied.    I have not commented upon all the authorities that were presented to me.    It is not because I have not read them, but because this opinion has reached such a length that it would be more than cumbersome to touch upon them all at this time.

The briefs of counsel show the marks of much industry on their part and have been of great help to me.    The case presents that always unfortunate situation of litigation between two absolutely innocent parties, one of whom has become a loser by reason of extraneous circumstances over which neither has control and for which the law gives no relief.

The petition of plaintiff will be dismissed and judgment for defendants for their costs herein will be entered.